UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BEN MOSBAH SAIDI,** | ) |
| | ) C.A. NO. 3:20-cv-00894-YK |
| **Plaintiff** | ) |
| | ) |
| v. | ) |
| | ) |
| **YORK COUNTY d/b/a YORK** | ) |
| **COUNTY PRISON, and** | ) |
| **TROY TYSON, ERIC BUSH,** | ) *Electronically Filed* |
| **BRANDON BANKARD,** | ) |
| **MICHAEL BAUGHER,** | ) |
| **JOHN DARYMAN,** | ) |
| **C.O. MARIN, C.O. SCHNEIDER,** | ) |
| **JOSHUA MARTINEZ, and** | ) |
| **JOHN/JANE DOES, in their** | ) |
| **individual capacities,** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR STAY**

**I.    FACTUAL STATEMENT AND PROCEDURAL HISTORY**

Ben M. Saidi (Plaintiff) is a Tunisian immigrant who has permanent resident status in the United States. Relevant to this matter, Plaintiff was incarcerated at York County Prison from August 2019 to February 2020.[1] During this time,

---

[1] As a result of criminal charges stemming from a minor auto accident, Plaintiff was sentenced to 1 - 3 years in prison. In December 2019, the charges against Plaintiff were vacated and he was released from that Prison on February 13, 2020.

Plaintiff had pre-existing injuries that were not repaired and had not healed.

From the time he entered the Prison in August 2019 through to his February 2020 release, Plaintiff suffered harassment and beatings from Corrections Officers (COs).  For example, Defendant Baugher ordered Plaintiff to take the top bunk in his cell, even though Plaintiff had lower bunk status due to back problems.  When Plaintiff refused to take the top bunk, Defendant Baugher told him that he would be sent to the hole for three reasons: Plaintiff is refusing to take the top bunk; Plaintiff's name is "Saidi"; and Plaintiff is from the Middle East.

Defendant Tyson called Plaintiff "a terrorist" in front of others and told Plaintiff that he would make his life "a living hell."  He told other COs at the Prison "to take care of him," meaning to punish and torture Plaintiff.  Defendant Tyson told Plaintiff that he and the other COs would make Plaintiff  "miserable" until he "commits suicide."  Plaintiff told Defendant Tyson that he would file a lawsuit against him for discrimination, but this only increased Defendant Tyson's harassment and mistreatment of Plaintiff.

COs would intimidate Plaintiff:  Defendant Bankard called Plaintiff an "illegal immigrant"; Defendant Baugher told Plaintiff he was a "mercenary"; others called Plaintiff  "a nigger" and "Bin Saidi," in an obvious attempt to connect Plaintiff to Osama Bin-Laden.

When Plaintiff told Defendant Bankard that he (Bankard) is a racist, Bankard told some COs about it and directed them "to take real good care of him." Plaintiff was continually abused by different COs.

In or about November 2029 while Plaintiff was on his knees in prayer, Defendant Marin or another Individual Defendant yanked the prayer towel from Plaintiff and interrupted his prayers. When Plaintiff complained to Defendant Marin or the other Individual Defendant for interfering with his prayers, the latter got very mad at Plaintiff. Later, Defendant Marin brought CO Martinez to search and trash Plaintiff's cell. CO Martinez tried to goad Plaintiff into a fight, saying: "Come on, bitch, let's rumble."

Plaintiff filed grievances about the harassment. He met with Defendant Daryman, Unit Manager, to complain about the harassment and mistreatment, but Daryman would take the side of the Individual Defendants. Defendant Daryman asked Plaintiff why he was filing so many grievances, adding that the grievances "are not going to get you anywhere." Not only was the discrimination allowed to proceed, but it increased because the Individual Defendants were angry about Plaintiff's grievances.

Plaintiff told Defendant Marin that he would take him (Marin) to court; Defendant Marin then reported that Plaintiff "threatened him" which led to Plaintiff's solitary confinement in the Restricted Housing Unit (RHU) commonly

called "the hole." On more than one occasion, Plaintiff was required to serve more days in the hole than other inmates accused of the same infraction.

On one occasion when Plaintiff was being escorted to pick up his legal mail, one of the Individual Defendants said: "You are taking him to where he can get some more beating." On another occasion, Plaintiff complained that he did not get to eat. An Individual Defendant asked him why he was mad, adding "You forgot the day the CERT beat the crap out of you."

The Defendants used any pretext to get Plaintiff in trouble. Plaintiff has been disciplined for frivolous reasons or for violations that he did not commit.

On December 30, 2019, Defendant Schneider and/or other Individual Defendants were escorting Plaintiff to a Prison medical office for a previously scheduled appointment. Plaintiff was shackled and handcuffed. Defendant Schneider or one of the Individual Defendants pulled and yanked Plaintiff's shoulder, even though he knew that Plaintiff's shoulders required rotator cuff surgery due to injury. When they were in the hallway near the INS office, Plaintiff asked Defendant Schneider or the Individual Defendant to stop pulling his shoulder. Defendant Schneider or the Individual Defendant told Plaintiff to "shut up" and, without warning, slammed Plaintiff's head against the wall and on the concrete floor. Defendant Schneider or the Individual Defendant slammed Plaintiff's head numerous times. Numerous Individual Defendants came to the scene and got on top of Plaintiff, pounding his back with their knees and twisting

his arms. For a brief time, Plaintiff lost consciousness. When Plaintiff came to, he was lying on the concrete floor in a pool of blood.

Plaintiff was taken to Central Medical and then to York Hospital. As a result of the beatings, Plaintiff had a dislocated jaw and his two front teeth were so badly damaged and loose that Plaintiff cannot use his front teeth to eat food. The pre-existing damage to Plaintiff's shoulders got worse.

On June 3, 2020, Plaintiff filed a six-count complaint against the Prison and individual COs. [ECF 1] and soon after filed an amended complaint. [ECF 5].

On March 15, 2021, Defendants filed a motion for summary judgment. [ECF 18, 19 & 20].

On April 1, 2021, Plaintiff filed a motion for a 7-day extension for filing his brief opposing Defendants' motion. [ECF 21], which the Court granted on April 5, 2021 [ECF 22].

On April 8, 2021, Plaintiff filed a motion to stay the litigation for 60 days. [ECF 23].

## II.  QUESTION PRESENTED

Whether the fact that Counsel is unable to locate Plaintiff's whereabouts justifies a 60-day stay of this litigation?

Answer: Yes.

### III.  LEGAL STANDARD

The decision to stay any facet of a legal proceeding lies within the sole discretion of the Court.  *See Cost Bros., Inc. v. Travelers Indem. Co.*, 760 F.2d 58, 60 (3d Cir. 1985)).  *See* also *Medversant Techs., LLC v. Leverage Health Solutions, LLC.*, 114 F. Supp. 3d 290, 298-99 (E.D. Pa. 2015), citing *Mendez v. Puerto Rican Int'l Cos.*, 553 F.3d 709, 712 (3d Cir. 2009).   The Court has the responsibility to control its docket and shepherding cases through the judicial system is a concomitant part of that overall responsibility.  *See Medversant Techs., LLC, supra; Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161, 182  (M.D. Pa. 2019).  This includes a determination as to whether a stay of pending litigation is appropriate.

In deciding a motion for a stay, the Court must conduct a balance test, weighing the relative interests of the parties. *See Indocarb Corp. v. Madhavan*, 2020 U.S. Dist. LEXIS 15805 at *17 (W.D. Pa. Jan. 29, 2020), citing *Landis v. North Amer. Co.*, 299 U.S. 248, 254-55 (1936).  Courts have identified the following factors when assessing parties' competing interests:

> 1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; 2) whether a denial of the stay would create a clear hardship or inequity for the moving party; 3) whether a stay would simplify the issues and the trial of the case; and 4) whether discovery is complete and a trial date has been set. *See Carlini v.*

*Glenn O. Hawbaker, Inc.*, 2018 U.S. Dist. LEXIS 37959 at *4 (W.D. Pa. March 8, 2018)(cit. omitted).

In addition, the length of the requested stay may also be relevant. *Structural Group, Inc. v. Liberty Mut. Ins. Co.*, 2008 U.S. Dist. LEXIS 82266 at *13 (M.D. Pa. October 16, 2008).

## IV.   ARGUMENT

In this matter, the equities weigh in favor of staying these proceedings for 60 days. Counsel assumed representation of Plaintiff in May 2020. Since then and except for brief periods, Plaintiff has been homeless in York, Pennsylvania. He has been living in the woods near the river. Plaintiff had a cellphone that he would use to stay in contact with Counsel, as well as his father-in-law in California. From time to time, Plaintiff would meet with a Counselor at the Office of Mental Health & Developmental Disabilities (MHDD) in York County.

For over three months, the MHDD Counselor, Plaintiff's father-in-law and Counsel have tried diligently to locate Plaintiff, but have been unsuccessful. Over the same period, Plaintiff has not contacted any of these individuals. During the harsh winter months, Plaintiff was homeless -- resisting the efforts of others to find him shelter. In or about December 2020, Plaintiff began calling Counsel in the middle of the night. He was agitated. He did not have his medicine. Plaintiff later contacted Counsel's Office and while still frustrated, Plaintiff sounded more stable. That was the last contact that Counsel's Office had with Plaintiff. In January 2021,

Plaintiff's father-in-law wired him money, but the father-n-law recently told Counsel's Office that Plaintiff never accessed the funds.

Counsel has contacted York County Police, York County Coroner, York County Prison, and York MHDD, but none has any information about Plaintiff. In addition to Counsel's efforts, the MHDD Counselor has contacted York Probation and the York City Police Department. These contacts had no information about Plaintiff.

Counsel maintains that in Plaintiff's absence, she cannot adequately represent his legal interests. He may be deceased or he may be alive somewhere, such as in a hospital. The pandemic creates an additional unknown - Plaintiff may be hospitalized with Covid-19 and unable to communicate with the few contacts he has.

The Defendants are not unduly prejudiced by a 60-day stay. The requested stay is limited and this litigation is in the early stages. After 60 days, the stay will automatically be lifted. Hopefully, Counsel will have discovered Plaintiff's whereabouts by then and be able to advise the Court as to the status of Counsel's representation.

## V.   CONCLUSION

Despite best efforts, Counsel has been unable to locate Plaintiff. Without Plaintiff's involvement, Counsel cannot effectively represent Plaintiff's legal interests. The totality of these unpleasant circumstances weigh in favor of staying

this litigation for 60-days -- a relatively short term.  Defendants cannot point to any undue prejudice as a result of the stay.  In fact, Defendants chose not to even depose Plaintiff during this litigation or serve any written discovery. There is no prejudice to Defendants in this matter.

      Based on the foregoing, Plaintiff's Counsel request for a 60-day stay should be granted.

      /s/ Leticia C. Chavez-Freed
Leticia C. Chavez-Freed, Esq.
PA Bar ID 323615
The Chavez-Freed Law Office
2600 N. 3rd Street, 2nd FL
Harrisburg, PA. 17110
Ph:  (717) 893-5698
*Counsel for Plaintiff Ben M. Saidi*

Dated: April 15, 2021